## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL BIERMAN,<br><br>    Plaintiff,<br><br> v.<br><br><br><br>KADMON HOLDINGS, INC., TASOS G. KONIDARIS, HARLAN W. WAKSAL, EUGENE BAUER, DAVID E. COHEN, ARTHUR KIRSCH, NANCY MILLER-RICH, and CYNTHIA SCHWALM,<br><br>    Defendants. | Civil Action No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Michael Bierman ("Plaintiff") by and through his undersigned attorneys, brings this action on behalf of himself, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Kadmon Holdings, Inc. ("Kadmon" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's public statements; and (d) review of other publicly available information concerning Kadmon and the Defendants.

## SUMMARY OF THE ACTION

1.      This is an action brought by Plaintiff against Kadmon and the Company's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed transaction (the "Proposed Transaction") between the Company and Sanofi, a *societe anonyme* formed under the laws of France ("Sanofi").

2.      On September 7, 2021, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Sanofi and Latour Merger Sub, Inc. ("Merger Sub"), a wholly owned indirect subsidiary of Sanofi.  Pursuant to the terms of the Merger Agreement, Merger Sub will merge with and into the Company with the Company surviving the merger as a wholloy owned indirect subsidiary of Sanofi. As a consequence of the merger, the Company's shareholders be entitled to receive $9.50 in cash for each share of Kadmon common stock they owned (the "Merger Consideration").

3.      On October 4, 2021, in order to convince the Company's shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading proxy statement with the SEC (the "Proxy Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Kadmon and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Kadmon shareholders before the vote on the Proposed Transaction or, in the event the Proposed

Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

6.      This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, the owner of Kadmon shares.

9.      Defendant Kadmon is incorporated under the laws of Delaware and has its principal executive offices located at 450 East 29th Street, New York, NY 10016.   The Company's common stock trades on the NASDAQ Stock Exchange under the symbol "KDMN."

10.      Defendant Tasos G. Konidaris ("Konidaris") is and has been the Chairman of the Board of Kadmon at all times during the relevant time period.

11.      Defendant Harlan W. Waksal ("Waksal") is and has been the president, Chief Executive Officer ("CEO") and a director of Kadmon at all times during the relevant time period.

12.    Defendant Eugene Bauer ("Bauer") is and has been a Kadmon director at all times during the relevant time period.

13.    Defendant David E. Cohen ("Cohen") is and has been a Kadmon director at all times during the relevant time period.

14.    Defendant Arthur Kirsch ("Kirsch") is and has been a Kadmon director at all times during the relevant time period.

15.    Defendant Nancy Miller-Rich ("Miller-Rich") is and has been a Kadmon director at all times during the relevant time period.

16.    Defendant Cynthia Schwalm ("Schwalm") is and has been a Kadmon director at all times during the relevant time period.

17.    Defendants Konidaris, Waksal, Bauer, Cohen, Kirsch, Miller-Rich, and Schwalm are collectively referred to herein as the "Individual Defendants."

18.    The Individual Defendants, along with Defendant Kadmon, are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

19.    Kadmon a biopharmaceutical company, discovers, develops, and commercializes small molecules and biologics primarily for the treatment of inflammatory and fibrotic diseases. Its lead product candidates include Belumosudil (KD025), an orally administered selective inhibitor of the rho-associated coiled-coil kinase 2 (ROCK2), which is in Phase II clinical trial for the treatment of chronic graft-versus-host, as well as systemic sclerosis, an autoimmune disease characterized by chronic inflammation, fibrosis, and vascular damage; KD045, an oral inhibitor of ROCK for the treatment of fibrotic diseases; and KD033, an anti-PD-L1/IL-15 fusion

protein for the treatment of cancer. The company also engages in developing Tesevatinib to treat autosomal dominant polycystic kidney disease; and CLOVIQUE, a trientine hydrochloride capsules for the treatment of Wilson's disease.

## The Company Announces the Proposed Transaction

20.     On September 8, 2021, the Company jointly issued a press release announcing the Proposed Transaction.  The press release stated in part:

**PARIS and NEW YORK – September 8, 2021 –** Sanofi has entered into a definitive merger agreement with Kadmon Holdings, Inc. (NASDAQ: KDMN) a biopharmaceutical company that discovers, develops, and markets transformative therapies for disease areas of significant unmet medical needs. The acquisition supports Sanofi's strategy to continue to grow its General Medicines core assets and will immediately add Rezurock™(belumosudil) to its transplant portfolio. Rezurock is a recently FDA-approved, first-in-class treatment for chronic graft-versus-host disease (cGVHD) for adult and pediatric patients 12 years and older who have failed at least two prior lines of systemic therapy.

Shareholders of Kadmon common stock will receive $9.50 per share in cash, which represents a total equity value of approximately $1.9 billion (on a fully diluted basis). The Sanofi and Kadmon Boards of Directors unanimously approved the transaction.

*"We are transforming and simplifying our General Medicines business and have shifted our focus on differentiated core assets in key markets,"* said Olivier Charmeil, Executive Vice President General Medicines. *"We are thrilled to add Kadmon's Rezurock to our well-established transplant portfolio. Our existing scale, expertise, and relationships in transplant create an ideal platform to achieve the full potential of Rezurock, which will address the significant unmet medical needs of patients with chronic graft-versus-host disease around the world."*

*"We are excited that Sanofi has acknowledged the value of Rezurock and the deep potential of our pipeline,"* said Harlan Waksal, M.D., President and Chief Executive Officer, Kadmon. *"By leveraging Sanofi's global resources and long-standing expertise in developing and commercializing innovative medicines, Rezurock is now well positioned for global accessibility, faster. I want to thank the entire Kadmon team, including management and the Board of Directors, and the Sanofi organization, for their ongoing commitment to patients and their caregivers."*

Sanofi's transplant business mainly consists of Thymoglobulin® (anti-thymocyte globulin), a polyclonal, anti-human thymocyte antibody preparation that acts as a broad immunosuppressive and immunomodulating agent and Mozobil® (plerixafor), a hematopoietic stem cell mobilizer. Both products are among General Medicines core assets and are currently registered and marketed in more than 65 countries.

In July 2021, the FDA approved Rezurock for the treatment of adult and pediatric patients 12 years and older with cGVHD after the failure of at least two prior lines of systemic therapy. Rezurock was launched in August in the United States. It is the first and only approved small molecule therapy that inhibits the Rho-associated coiled-coil kinase 2 (ROCK2), a signaling pathway that modulates inflammatory response and fibrotic processes. Sanofi will work closely with regulatory authorities across different geographies to ensure that patients suffering from cGVHD can benefit from belumosudil treatment as early as possible. Kadmon is also developing Rezurock for the treatment of diffuse cutaneous systemic sclerosis, with an open-label Phase 2 clinical trial currently ongoing.

Kadmon's pipeline includes drug candidates for immune and fibrotic diseases as well as immuno-oncology therapies.

The transaction is expected to be modestly dilutive to Sanofi's EPS in 2022.

**Transaction Terms**

Under the terms of the merger agreement, holders of Kadmon's common stock will receive $9.50 per share in an all-cash transaction, reflecting a total equity value of Kadmon of approximately $1.9 billion. The offer price represents a premium of 79% over the closing price on September 7, 2021 and a premium of approximately 113% over the 60 trading days volume weighted average price.

The consummation of the transaction is subject to customary closing conditions, including the approval of holders of a majority of the outstanding shares of Kadmon voting stock, the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and other customary conditions. Following the successful completion of the merger, a wholly owned subsidiary of Sanofi will merge with Kadmon and the outstanding Kadmon shares will receive $9.50 per share in cash. Sanofi plans to fund the transaction with available cash resources. Subject to the satisfaction or waiver of customary closing conditions, Sanofi expects to complete the acquisition in the fourth quarter of 2021.

Weil, Gotshal & Manges LLP is acting as legal counsel to Sanofi. Cantor Fitzgerald & Co. and Moelis & Company LLC are acting as exclusive financial advisors to Kadmon in the transaction, while DLA Piper LLP (US) is acting as legal counsel.

## FALSE AND MISLEADING STATEMENTS
## AND/OR MATERIAL OMISSIONS IN THE PROXY STATEMENT

21.    On October 4, 2021, the Company authorized the filing of the Proxy Statement with the SEC.  The Proxy Statement recommends that the Company's shareholders vote in favor of the Proposed Transaction.

22.    Defendants were obligated to carefully review the Proxy Statement prior to its filing with the SEC and dissemination to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make informed decisions regarding whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Material False and Misleading Statements or Material
### Misrepresentations or Omissions Regarding the Company's Financial Projection

23.    The Proxy Statement contains projections prepared by the Company's management concerning the Proposed Transaction, but fails to provide material information concerning such.

24.    The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[1]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new

---

[1] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measuresthesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, available at http://www.nytimes.com/2016/04/24/business/fantasy-mathis-helping-companies-spin-ossesinto-profits.html?_r=0.

and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[2] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

25.     In order to make management's projections included in the Proxy Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

26.     Specifically, with respect to the Company's projections, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) PoS adjusted net sales revenue; (ii) EBIT; and (iii) Unlevered Free Cash Flow.

27.     Disclosure of the above information is vital to provide investors with the complete mix of information necessary to make an informed decision when voting on the Proposed Transaction.   Specifically, the above information would provide shareholders with a better understanding of the analyses performed by the Company's financial advisor in support of its opinion.

**Material False and Misleading Statements or Material**
**<u>Misrepresentations or Omissions Regarding the Financial Opinions</u>**

28.     The Proxy Statement contains the financial analyses and opinion of Cantor Fitzgerald & Co. ("Cantor") and Moelis & Company LLC ("Moelis") concerning the Proposed Transaction, but fails to provide material information concerning such.

---

[2] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

29.    With respect to Cantor's *Selected Companies Analysis*, the Proxy Statement fails to disclose: (i) the basis underlying Cantor's selection of the ten companies observed in the analysis; (ii) the enterprise values for the selected companies in the analysis; the inputs and assumptions underlying Cantor's use of a range of 2026E revenue multiples of 1.00x to 3.00x.

30.    With respect to Cantor's *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose: (i) the basis underlying Cantor's selection of the ten transactions observed in the analysis; (ii) the basis underlying Cantor's choices for the companies selected for the use of a range of enterprise values of $1,250 million to $2,000 million; and (iii) the basis underlying Cantor's use of the range of 2026E revenue multiples of 2.25x to 4.25x used in the analysis.

31.    With respect to Cantor Fitzgerald's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the inputs and assumptions underlying Cantor's use of discount rates ranging from 9.5% to 11.5%; (ii) the Company's terminal values; (iii) the inputs and assumptions underlying Cantor's assumption that the Company's after-tax unlevered free cash flows would decline in perpetuity after December 31, 2034 at a rates ranging from 60% to 10% year-over-year; and (iv) the number of fully diluted outstanding shares of Kadmon common stock as of September 3, 2021.

32.    With respect to Moelis' *Discounted Cash Flow Analysis* for the Company, the Proxy Statement fails to disclose: (i) the inputs and assumptions underlying Moelis' use of discount rates ranging from 8.25% to 10.75%; (ii) the Company's terminal values; (iii) the estimated range of the Company's weighted average cost of capital; (iv) the inputs and assumptions underlying Moelis' use of a perpetuity growth rate range of 75% to 25%.

33.    With respect to Moelis' *Selected Publicly Traded Companies Analysis*, the Proxy Statement fails to disclose: (i) the basis underlying Moelis' selection of the companies observed in the analysis; (ii) the inputs and assumptions underlying Moelis' use of a range of 2026E revenue multiples of 1.50x to 2.25x for the KD025 asset; (iii) the inputs and assumptions underlying Moelis' use of a $175 million to $350 million enterprise value for the Company's IO Platform assets.

34.    With respect to Moelis' *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose: (i) the basis underlying Moelis' selection of the transactions observed in the analysis; (ii) the inputs and assumptions underlying Moelis' use of a range of TEV multiples of 1.50x to 3.00x; and (iii) the inputs and assumptions underlying Moelis' use of a range for the Company's Total Enterprise Value of $1.5 billion to $2.5 billion.

35.    When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides shareholders with a basis to project the future financial performance of a company and allows shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion.

36.    Without the above described information, the Company's shareholders are unable to cast a fully informed vote on the Proposed Transactions.  Accordingly, in order to provide shareholders with a complete mix of information, the omitted information described above should be disclosed.

## COUNT I

### (Against All Defendants for Violations of Section 14(a)
### of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

37.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

38.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

39.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

40.     Defendants have issued the Proxy Statement with the intention of soliciting shareholders support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections for the Company.

41.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Defendants, by virtue

of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

42.    The Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

43.    The Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

44.    The Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

45.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

46.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

47.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48.     The Individual Defendants acted as controlling persons of Kadmon within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Kadmon, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

49.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

50.     In particular, each of the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

51.    In addition, as set forth in the Proxy Statement at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

52.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

53.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

54.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      Directing the Individual Defendants to disseminate an Amendment to the Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

C.      Directing Defendants to account to Plaintiff for all damages sustained because of the wrongs complained of herein;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 13, 2021

Respectfully submitted,

By: */s/ Joshua M. Lifshitz*
Joshua M. Lifshitz
Email: jml@jlclasslaw.com
**LIFSHITZ LAW FIRM, P.C.**
1190 Broadway,
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*